## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

WHALECO INC.,

              *Plaintiff*,

    v.

JEFFREY GLUCK; GLUCK LAW FIRM P.C.;
ALEC MONOPOLY ART, LLC; ALEC
MONOPOLY, LLC; and COOKIES SF LLC,

              *Defendants*.

Civil Action No. 1:25-cv-11233

**JURY DEMAND**

1

## COMPLAINT

Plaintiff Whaleco Inc. d/b/a Temu ("Temu"), by its undersigned attorneys, hereby brings the present action against Defendants Jeffrey Gluck, Esq. and Gluck Law Firm P.C. (collectively "Gluck") and two of his clients—Alec Monopoly Art, LLC; Alec Monopoly, LLC (collectively, "Alec Monopoly"); and Cookies SF LLC ("Cookies") (collectively, "Gluck Clients")—based on fraudulent representations by Gluck made to induce Temu to enter into settlement agreements with the Gluck Clients that Temu would not otherwise have entered into.  Temu files this action to rescind the settlement agreements and return to the status quo ante, including requiring Gluck and the Gluck Clients to return Temu's settlement payments, and in the alternative, for damages.  In support thereof Temu alleges as follows:

## NATURE OF THE ACTION

This case is about an attorney committing fraud during settlement negotiations to induce the opposing party to enter into settlement agreements that it would not otherwise have entered into, and thereby enriching himself and his clients.

The agreements, which were effective as of December 3, 2024, resolved claims against Temu for alleged copyright and trademark infringement associated with products that third-party sellers offered for sale on Temu's electronic marketplace.  Although it denied any liability or wrongdoing, Temu decided to settle to secure peace and to avoid the burden and distractions of litigation.  Because Temu sought finality with Gluck and the Gluck Clients, it insisted as a material condition for each settlement agreement that Gluck expressly represent that Gluck ████████████████████████████████████████████ ████████████████████  In fact, that representation was so important that Temu insisted Gluck sign onto the settlement agreements and that ██████████████████████████████████



In other words, Gluck knew that his representations—███████████████████ ████████████████████████████████████—were critical to Temu, and that ████████████████████████████████████████████████.

But Gluck lied in making these representations.  And he did so knowingly, in order to induce Temu into agreeing to settlement terms to which Temu otherwise would not have agreed.

On November 12, 2024, just days after Gluck and the Gluck Clients had signed the agreements but before the agreements were effective, Gluck advertised on social media for new clients to sue Temu.  Then, just shortly after the settlement agreements became effective, Gluck threatened Temu with a new lawsuit on behalf of additional clients with which Gluck had long and tight relationships.  By February 2025 Gluck had sent Temu an 80-page draft complaint on behalf of those clients, and all but admitted that the representations he had made a few months earlier were false by stating "[w]e have been investigating Temu for several years" and that the new complaint was the result of that years-long research effort.

Gluck hid all this from Temu, knowing that Temu was relying on his representations to the contrary and that Temu would not have entered into the settlement agreements had it known the truth.

Now that it has learned the truth, Temu brings this action against Gluck for various forms of misconduct, impropriety, lies, and deceit including actions taken on behalf of the Gluck Clients with respect to those settlement agreements.  Temu seeks to rescind the agreements and recover what it has paid pursuant to those agreements.

## THE PARTIES

1.      Whaleco Inc. d/b/a Temu is a Delaware corporation with its principal place of business in Boston, Massachusetts.

2.      Upon information and belief, Defendant Jeffrey S. Gluck, Esq. is a California citizen licensed to practice law in New York and California.

3.      Upon information and belief, Mr. Gluck is the sole operator of Defendant Gluck Law Firm P.C., located at 16950 Via De Santa Fe Rancho Santa Fe, CA 92067.

4.      Upon information and belief, Defendants Alec Monopoly Art, LLC and Alec Monopoly, LLC ("Alec Monopoly") are limited liability companies with a principal place of business in Dorado, Puerto Rico.  The sole member of Alec Monopoly Art, LLC and Alec Monopoly, LLC is Alexander Andon, who is a citizen and resident of Puerto Rico.

5.      Upon information and belief, Defendant Cookies SF LLC ("Cookies") is a limited liability company with a principal place of business in San Leandro, California.  The members of Cookies are Gilbert Milam, a citizen and resident of the state of California; Bryan Wilson, a citizen and resident of the state of California; Xiaozheng Yang, a citizen and resident of the state of California; and Eric Fan, a citizen and resident of the state of California.

## JURISDICTION AND VENUE

6.      This Court has federal diversity jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332.  Complete diversity exists between the parties—Plaintiff Temu does not share citizenship with any defendant—and the amount in controversy exceeds $75,000 because Temu seeks the return of, or, in the alternative, damages for, more than that amount.

7.     This Court has personal jurisdiction over each of the named Defendants.  This action arises out of and relates to their numerous contacts with Temu—which is headquartered in Boston, Massachusetts.

8.     As discussed in more detail below and incorporated herein by reference, Gluck and the Gluck Clients have purposefully availed themselves of this forum and have harmed Temu, which has a principal place of business in Boston, in multiple ways, as shown by the following examples.

9.     The settlement agreement Temu entered with Alec Monopoly and Gluck ████████ ███████████████████████████████████████████.

10.     While the agreement with Cookies does not designate a specific forum, when this dispute began to arise, Gluck threatened to sue Temu to enforce the settlement agreement and sent Temu a draft complaint in which Cookies would sue Temu in this Court.  In support of its jurisdictional allegations, the complaint conceded that "a substantial part of the events giving rise to [Cookies's] claims occurred in this district."

11.     Further, even after entering into these settlements in December of 2024, Gluck pursued a "collaboration" with Temu, while simultaneously threatening Temu with further lawsuits in the event Temu did not hire him.

12.     Gluck repeatedly transacted business in Massachusetts by initiating settlement negotiations with Temu, and the Gluck Clients each ratified Gluck's acts by executing contracts that included representations from Gluck as a material term and by accepting money from a Massachusetts-based company.  Further, the settlement agreements contemplate ████████ █████████████████████████████████ For instance, ████████████████████

5

████████████████████████████████████████████████████

████████████████████████████████████ .

13.    Moreover, as Temu's claims involve the common issue of Gluck's misrepresentations, specific jurisdiction over the Gluck Clients is also reasonable and appropriate to effectively and efficiently resolve the controversy.

14.    Given this history, it is foreseeable and reasonable for this Court to adjudicate Temu's claims against Gluck and the Gluck Clients.  Resolving these claims in Temu's home forum, and the ████████████████████████████████ , is reasonable.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).  Here, substantial parts of the events giving rise to the claims have occurred in Massachusetts:  Gluck has repeatedly attempted to represent Temu, whose principal place of business is in Boston, initiated significant settlement negotiations with Temu, and expressly threatened litigation against Temu on behalf of the Gluck Clients in this Court; and, in the settlement agreement with Alec Monopoly Art, LLC, ████████████████████████████████████ .

## FACTS COMMON TO ALL COUNTS

16.    Whaleco Inc. operates an e-commerce marketplace in the United States at Temu.com (the "Temu Marketplace").  The Temu Marketplace is also accessible via the Temu mobile application, which can be downloaded on both the Apple App Store and the Google Play Store.

17.    The Temu Marketplace has operated in the United States since September 1, 2022. Consumers in the United States can purchase goods on the Temu Marketplace from third party sellers in many categories, including clothing, household goods, cosmetics, appliances, and electronics.

18.    Mr. Gluck is a lawyer, who holds himself out as a specialist in intellectual property litigation, particularly as it relates to street- and graffiti-artists and fashion.

19.    In November 2023, Mr. Gluck identified himself as the lawyer representing Cookies and Alec Monopoly, among others. He threatened that, absent settlement, he would file suit against Temu on behalf of the Gluck Clients. Though it denied any liability or wrongdoing, Temu hoped to secure lasting peace and avoid the burden and disruption of litigation. To that end, Temu began to explore the possibility of a resolution with Gluck and the Gluck Clients in good faith.

20.    By the fall of 2024, the parties had reached agreements in principle, which were then memorialized in written agreements. With a few exceptions, the agreements for Alec Monopoly and Cookies contain nearly identical language, including that the ███████████ ████████████████████████████████████████████████ The settlement agreement with Alec Monopoly included a ███████████████████ ████████████████████████████.

21.    Beyond negotiating the agreements on behalf of his clients, Gluck also participated as a party to each agreement with regards to the express representations contained in Paragraphs 2.4 and 2.5. ██████████████████████████████████ ████████████████████████████████████ ████████████ Paragraphs 2.4 and 2.5 read as follows:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

███████████████████████████████████████████████████

████████████.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████.

Exhibit 1 at ¶ 2.4-2.5; Exhibit 2 at ¶ 2.4-2.5 ("Paragraph 2.4" and "Paragraph 2.5").

22.    Gluck also specifically signed each agreement as to these two Paragraphs. For example, the following shows Gluck's signature in the Alec Monopoly and Cookies agreements.



23.    By agreeing to paragraphs 2.4 and 2.5, Gluck represented that ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████.

24.    Temu paid to settle with the Gluck Clients based on the truth of Gluck's representation.  Had Temu known that Gluck's representations were false or inaccurate, Temu would not have settled or agreed to the terms in the agreements to settle the claims.

25.     Moreover, upon information and belief, Gluck was working for the Gluck Clients on a contingency fee basis and was personally motivated for the settlement amount to be as high as possible, both to obtain a near-term fee representing a percentage of the recovery and to avoid having to shoulder the costs of litigation.[1]

26.     Despite signing the representations in the settlement agreement on November 3 and 9, 2024, and despite knowing that ██████████████████████████████████ ████████████, Gluck purposefully lied. ██████████████████████████████ █████████████████████████████████████████████████████████████ ██████.

27.     With the ink of his signature on the settlement agreements barely dry, on November 12, 2024—merely three days after signing the Alec Monopoly agreement and nine days after signing the Cookies agreement, but before Temu had executed either agreement—Gluck had already begun quietly advertising for clients to sue Temu.  For example, on his Instagram account, Gluck posted about a news story discussing his lawsuit against another e-commerce platform, Shein:

---

[1] "For litigation purposes, I often work on a contingency fee basis. My clients only pay me if I get them paid." https://hypebeast.com/2016/6/jeff-gluck-streetwear-lawyer.



In the post, published on November 12, 2024, Gluck used thinly-veiled language to solicit clients interested in suing Temu or its competitor Shein. Specifically, he wrote, "***Has your work been copied <u>by one of these fast fashion platforms</u>? We want to hear from you.***" (emphasis added). Gluck regularly referred to both companies as "fast fashion platforms."

      28.    In other words, despite representing on November 3 and 9, 2024 that ███████████

███████████████████████████████████, his post on November 12, 2024 plainly shows he was already marketing for clients to sue "fast fashion" companies like Shein and Temu. The agreements with the Gluck Clients—including Gluck's representations—went into

force when Temu signed on December 3, 2024.  Temu learned of this post only recently, after it made the initial payment.

29.    Gluck's use of the term "fast fashion platforms" in his Instagram post was understood by commenters as including Temu.  For example, one responded to Gluck's question saying, "Yes by temu."

30.    Plainly, Gluck's Instagram advertising solicited others to bring claims against Temu.  At no time, however, did he attempt to correct his contractual representation before Temu signed the agreement.

31.    What is more, as explained in further detail below, Gluck in fact already *did* have other clients waiting in the wings to sue Temu at the time the agreements were executed.

32.    Gluck kept quiet and concealed from Temu the false nature of his representations while Temu was evaluating the agreement.  Relying on Gluck's representations, Temu signed the agreements on December 3, 2024 and made a substantial initial payment on January 7, 2025 to Alec Monopoly and on January 8, 2025 to Cookies.  At that time, Temu did not know that Gluck's representations were false.  If Temu had known, it would not have entered into the agreements or made the initial payment.

33.    Once the wire cleared, Gluck proceeded with the actions he had planned all along. On January 16, 2025, Gluck called to discuss a potential "collaboration" with Temu.  On this call, Gluck threatened that absent Temu agreeing to such "collaboration," he would have no reason not to pursue litigation against Temu.

34.    On January 24, 2025, Gluck called Temu's counsel to reveal that he had other clients with copyright claims.  During this call Gluck again threatened to institute new copyright lawsuits against Temu.  Temu wanted to investigate his claims that third parties had placed

11

infringing products on its platform and, if appropriate, remove those products. It therefore asked Gluck for details about the alleged infringement. Gluck refused to provide any information.

35.     After the call, on February 3, Temu's counsel responded to Gluck, explaining:

Temu highly values and respects intellectual property rights and is willing to collaborate with rights holders to combat against any alleged infringement on its platform. If you are aware of any listings on the Temu platform that allegedly infringe the copyright and trademark rights of your clients – something you alluded to in our second call, without any details – Temu is prepared to promptly review and address those allegations. We ask that you share specifics on the alleged copyright or trademark infringements you mentioned, the listings you are concerned with, and the clients you represent. Temu may then properly investigate and address them in accordance with Temu's take down procedures. We are hopeful that you will provide this information so that the parties can have a productive discussion to resolve your clients' concerns and avoid unnecessary litigation.

36.     On or about February 12, 2025, Gluck had another call with outside counsel for Temu, informing them he had fashion clients and others with copyright and trademark claims against Temu. Gluck again refused to provide details about his clients or the alleged infringement, and told Temu's counsel that he would not send takedown notices to Temu.

37.     Rather than acting as soon as possible to assist Temu in taking down the allegedly infringing material, Gluck waited until February 20, 2025 to email Temu's counsel a draft complaint. The complaint was over 80 pages long. It named the following plaintiffs: Diamond Supply Company ("Diamond Supply"), After Market, Inc. ("Market"), Iron Eye Art Group, Inc. ("RETNA"), Ravenite LLC ("SSUR"), Estevan Oriol, Clot Co., Ltd. ("Clot"), and Edison Chen. The draft complaint alleged violations under the Lanham Act, Copyright Act, various California unfair competition laws, and California misappropriation laws.

38.     After receiving the draft complaint, on February 24, 2025, outside counsel for Temu wrote to Gluck, noting that Gluck never sent any takedown notices regarding the listings at issue in the draft complaint.  After receiving the draft complaint, Temu investigated and immediately took down all the allegedly infringing items it was able to identify from the draft complaint, despite the fact that Gluck did not include in his draft complaint any URLs for specific products, but only incomplete screenshots.

39.     In the discussions that followed, Gluck admitted that these claims had long been in the works—thus proving that his representation in Paragraph 2.4 was false.  Specifically, on February 25, 2025, Gluck wrote to Temu's counsel: "*We have been investigating Temu for several years.  The draft complaint outlines our well-researched position regarding Temu's fraudulent marketplace and unlawful conduct*."  This admission leaves no doubt that when Gluck represented on November 3 and 9, 2024 that ███████████████████████████, he knew this statement was false, as he and his clients had been preparing litigation against Temu for "several years."  And his representations continued to be false through December 3, 2024 when Temu signed the agreements and they became effective.

40.     Further evidencing the falsity of Gluck's representations is the fact that he had pre-existing relationships with many of the plaintiffs in the draft complaint.

41.     For example, upon information and belief, Gluck has extensive dealings with Market.  Beginning in October 2018, Market sold products with Gluck's tagline "Call My Lawyer," and Gluck repeatedly promoted the products on his Instagram account.  In his first post on Instagram on October 8, 2018 about the "Call My Lawyer" apparel, which included the name and phone number of Gluck's law firm, Gluck's account noted that it was a "Limited edition courtesy of @chinatownmarket thank you @mikecherman."  The @chinatownmarket mention

refers to Market's Instagram account, and the @mikecherman mention refers to the founder of Market.



42.    Gluck also collaborated with Market and a company called Montana Cans on a spray paint can, presumably aimed at graffiti artists.



43.    The can includes the name of and phone number for Gluck's law firm.  According to Montana Cans' website:  "After a successful sell-through of a [sic] CALL MY LAWYER t-shirts by China Town Market, the obvious next step was to transform the design on the tools of which the artists use to create the work.  The black lithography of the CALL MY LAWYER can boast [sic] a similar aesthetic of the Montana BLACK can.  A can that has positioned itself as the ultimate tool to fight the system since day one.  Filled with benchmark black 9001 color, this can will find it's [sic] way into the hands of the artists via, The Seventh Letter, China Town Market and Jeff Gluck himself."[2]

44.    In 2020, Gluck collaborated with Market to design apparel and sell apparel.  According to a December 2020 article on the website Hypebeast, Gluck was described as "making moves as a creator himself.  He recently partnered up with Chinatown Market to design special merchandise including a bright spot tie-dye jacket and graphic tees emblazoned with his signature tagline 'Call My Lawyer' with a mysterious number beneath the text: 1(888)464-7065."[3]  The article includes the following photograph, showing Gluck's work with Market:

[2] https://www.montana-cans.blog/new-montanacans-collabo-call-my-lawyer-protecting-artists-rights/
[3] https://hypebeast.com/2020/12/chinatown-market-taps-street-arts-favorite-lawyer-to-design-special-apparel



45.     Market continues to sell "Call My Lawyer" merchandise to this day.  For example, this hoodie is one of a number of articles with Gluck's text currently for sale on Market's website.[4]



---

[4] https://marketstudios.com/products/call-my-lawyer-3d-hoodie

46.     Other posts by Gluck are below:







In the immediately above post from February 26, 2020, Gluck's Instagram account reads, "Something special coming soon + @chinatownmarket @montanacans." Gluck also follows Market and Mike Cherman, founder of Market, on Instagram.

47.     Based on social media posts and news articles, Gluck has had a relationship with Market at least since 2018, and a business relationship with Market since at least 2020.

48.     Gluck's draft complaint includes allegations that a Temu Marketplace vendor used the "Call My Lawyer" language.



49.    Upon information and belief, given Gluck's close collaborations with Market, his status as a "creator" of the design for Market, and, on information and belief, his personal financial interest, as well as his statements that "we have been investigating Temu for several years," Gluck knew that ████████████████ when he signed the settlement agreements or, at the very least, planned to solicit Market to do so.  Nevertheless, he represented otherwise.

50.    Gluck also has past relationships with three other plaintiffs listed in the draft complaint—Clot, RETNA and SSUR.  Upon information and belief, Gluck has represented each of those companies in the past.

51.    For example, Gluck has been the registered agent for "Clot USA, LLC" since it was formed in California in September 2013 until it was terminated in 2020.  Clot USA, LLC was managed by Edison Chen and Kevin Poon, the principals of Clot.  Edison Chen is identified as a plaintiff in the draft complaint.

52.    In addition, Gluck is quoted in an article about litigation over the sale of RETNA's work at an auction.  In the article he "count[ed] himself" among the team working with RETNA.[5]

53.    Upon information and belief, Gluck has also advised SSUR.  For example, an article from 2016 quotes Russ Karablin, the founder of SSUR, saying Gluck "is not only an amazing sounding board for legal issues for me, but also has an intelligent understanding of the artist environment."[6]  Gluck follows SSUR on Instagram.

54.    Gluck also follows on Instagram a number of the other plaintiffs in the draft complaint, including Estevan Oriol and Nicky Diamonds, the principal of Diamond Supply.

55.    Given Gluck's work and relationships with Market, Clot, RETNA, and SSUR, including apparent legal assistance related to their creations, as well as Gluck's advertising for clients to sue fast fashion companies like Temu just after signing the settlement agreements, his statement that "we have been investigating Temu for several years," and the timing of the threats, upon information and belief, Gluck knew that Market, Clot, RETNA, and SSUR ███████████ ████████████████████████████████, but represented otherwise.

56.    During this time, Temu has performed its obligations under the contract and has made all payments due to date.  From after the time that Temu discovered Gluck's misconduct, it made all payments under protest, expressly reserving all of its rights, including to obtain repayment of these and all other payments.

## COUNT ONE
## Intentional Misrepresentation and Fraudulent Inducement

57.    Temu repeats and realleges the allegations set forth above as if fully set forth herein.

---

[5] https://news.artnet.com/art-world/street-artist-retna-sues-heritage-auctions-and-landlord-2603202
[6] https://hypebeast.com/2016/6/jeff-gluck-streetwear-lawyer

58.    The settlement agreements executed by Temu, Gluck, and the Gluck Clients contain the following representation: ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ Exhibit 1 at ¶ 2.4; Exhibit 2 at ¶ 2.4.  As expressly reflected in the settlement agreement, those representations were ████████████████████████████████████.

59.    Gluck's representations that neither he nor his firm had ████████████████

████████████████████████████████████████ were false.

60.    On November 12, 2024, just after he signed the settlement agreements, but before the agreements were fully executed or effective, Gluck advertised for clients to sue Temu.

61.    On January 16, 2025, just weeks after the settlement agreements became effective and mere days after Temu made an initial payment under the settlement agreements, Gluck began threatening Temu anew.  On January 16, 2025, Gluck intimated to Temu's counsel that if Temu did not want to partner with him, he would likely have other clients wanting to sue Temu.  On January 24, 2025, Gluck explicitly threatened multiple claims against Temu on behalf of other then-unnamed clients.  In February 2025, Gluck sent Temu a draft complaint spanning more than 80 pages, listing multiple plaintiffs, and alleging that Temu violated the Lanham Act and Copyright Act, among other laws.

62.    Upon information and belief, and as set forth above, Gluck's relationships with the plaintiffs in the draft complaint—including his commercial relationship with Market, with whom he created one of the designs allegedly at issue in his new set of claims, and as legal counsel to

21

several other plaintiffs in the draft complaint—pre-dated the execution of the settlement agreements, and Gluck was informed and had notice of ████████████████████ ████████████████████████████████.

63.     Further, despite his representation in the settlement agreements that ████████ ████████████████████████████████████████████████████ ██████████████████████, on February 25, 2025, Gluck informed Temu's counsel that he and his clients had been investigating Temu "*for several years*."

64.     These facts demonstrate that Gluck had ████████████████████ ██████████████████ before or, at minimum, at the time of making his contrary representation.

65.     Gluck, as the sole attorney of Gluck Law Firm P.C., necessarily knew of his own intentions and those of his law firm when making the representation in Paragraph 2.4.   His Instagram post just three days after signing the Alec Monopoly agreement, followed by his subsequent threats of litigation on behalf of multiple clients within weeks of the agreements becoming effective, and his own admission that he had been "investigating Temu for several years," show that Gluck knew his representation to be false.   In the alternative, Gluck made such statements recklessly without regard to whether they were true or false.

66.     Gluck, knowing the intentions of his clients, also knew that his statement with regard to ██████████████ was false.   For example, Gluck knew of his collaboration with Market prior to the signing of the settlement agreements, and upon information and belief, knew that ██████████████████. Upon information and belief, Gluck also knew of works from at least Clot, SSUR, and RETNA based on his representation of them, and therefore knew that Clot, SSUR, and RETNA ██████████████████. Moreover, upon information and belief, Gluck was the legal agent for his clients and thus would have had knowledge of the status of their cases

22

and legal intentions regarding Temu, and knew that the statement made in the settlement agreements was false based on his interactions and relationship with his clients, including at least Market, Clot, SSUR, and RETNA. In the alternative, he made the statements in the settlement agreement recklessly without regard to whether they were true or false. Given Gluck's relationships with his clients and business partners, including at least Market, CLOT, SSUR, and RETNA, and his previous assertions against Temu, upon information and belief, Gluck made the representations in Paragraph 2.4 of the settlement agreements falsely or without regard for what he knew about his clients' and business partners' intentions.

67.    Upon information and belief, Gluck made the representation in Paragraph 2.4 with the intention that Temu would rely on the representation to enter into the settlement agreements and assign a higher value to the agreements. The settlement agreements each contain a provision stating that ███████████████████████████████████████████████ ████████████████████ Exhibit 1 at ¶ 2.5; Exhibit 2 at ¶ 2.5. Gluck's intentional misrepresentation and fraudulent inducement had the effect of inducing Temu to settle the claims on terms Temu would not have agreed to but for Gluck's representations.

68.    Temu relied on Gluck's representation about his own intentions and the intentions of his clients in entering into the settlement agreements. Paragraph 2.4 was material to Temu, as Gluck's representation that ███████████████████████████████████████ ████████████████████████████████████████ would, and should, have resulted in some peace for Temu. The settlement agreements reiterate the importance of the representations to the parties, stating that the parties are entering into the agreements █████████████████ ██████████████████████████ Paragraph 2.5. Without those representations, Temu would not have entered into the agreements.

23

69.     Temu's reliance was reasonable as Gluck was in the best position to know and communicate his intentions regarding his and his firm's ████████████████████ ███████████████████. Temu also reasonably relied on Gluck to ascertain and communicate his new clients' intentions regarding ██████████, given that Gluck was, for example, Market's business partner and collaborator on an item Gluck now accuses Temu of infringing, as well as Clot's, SSUR's, and RETNA's attorney or agent, from which he obtained an intimate understanding of their works. Moreover, Temu's reliance was reasonable given that the settlement agreements contained a provision ██████████████████████████ █████████████████████████████████████████. Section 2.5 of the settlement agreements provide that █████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████

70.     Temu is entitled to rescission of the settlement agreements entered into by Temu, Gluck, Cookies, and Alec Monopoly. Temu paid to settle with Gluck's clients based on the truth of Gluck's representation, but Temu would not have otherwise settled or agreed to the terms in the agreements if it knew Gluck's representations were false.

71.     As a result of Gluck's misrepresentations, Temu has also incurred damages including investigating Gluck's new claims, responding to Gluck, hiring outside counsel, and filing this lawsuit.

**COUNT TWO**
**Negligent Misrepresentation**

72.     Temu repeats and realleges the allegations set forth above as if fully set forth herein.

73.    The settlement agreements executed by Temu, Gluck, and the Gluck Clients contain the representations in Paragraph 2.4 of these agreements.

74.    Gluck's representation that neither he nor his firm had ███████████████ ████████████████████████████████████████████████████ was false.

75.    On November 12, 2024, just after he signed the settlement agreements, Gluck posted on Instagram to solicit clients to sue fast fashion companies like Temu.

76.    On January 16, 2025, less than six weeks after the settlement agreements became effective and mere days after Temu made an initial payment under the settlement agreement, Gluck began the process of threatening Temu anew.  On January 24, 2025, Gluck threatened multiple claims against Temu on behalf of other unnamed clients.  In February 2025, Gluck sent Temu a draft complaint, spanning more than 80 pages, listing multiple plaintiffs, and alleging that Temu violated the Lanham Act and Copyright Act, among other laws.

77.    Upon information and belief, and as set forth above, Gluck's relationships with the plaintiffs in the draft complaint—including his commercial relationship with Market, with whom he created one of the designs allegedly at issue in his new set of claims, and as legal counsel to the other plaintiffs in the draft complaint—pre-dated the execution of the settlement agreements, and Gluck was informed and had notice of ████████████████████████████ before he made his false representations to Temu.

78.    Further, despite his representation in the settlement agreements that ███████ ████████████████████████████████████████████████████ █████████████████████, on February 25, 2025, Gluck informed Temu's counsel that he and his clients had been investigating Temu "*for several years*."  These facts demonstrate that

███████████████████████████████████████████████ before or, at minimum, at the time of making his contrary representation.

79.    Gluck failed to exercise reasonable care or competence in making the representation in Paragraph 2.4. Gluck was in the best position to know his own intentions regarding ███████████████████████████████████, for which he is the sole attorney. And as the sole attorney of the Gluck Law Firm, Gluck failed to exercise reasonable care to inquire into whether any of his clients or business partners—which, upon information and belief, included at least Market, Clot, RETNA, and SSUR—███████████████████. Gluck also failed to exercise reasonable care to inform Temu about ███████████████████ ███████████ before Temu signed the agreement.

80.    Gluck was aware, or reasonably should have been aware, that Temu would rely on the veracity of his representation to value the settlement amount and obtain lasting peace with Gluck and Gluck's clients. In Paragraph 2.5 of the settlement agreements, Gluck acknowledged that ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████. Gluck's negligent misrepresentation had the effect of inducing Temu to settle the claims on terms Temu would not have agreed to but for Gluck's representations thereby driving up the price of the settlement.

81.    Temu relied on Gluck's representation about his own intentions and the intentions of his clients in entering into the settlement agreements. Temu's reliance was reasonable as Gluck was in the best position to know and communicate his intentions regarding his and his firm's ████ ███████████████████████████████. Temu also reasonably relied on Gluck

to ascertain and communicate his new clients' intentions regarding ██████████, given that Gluck

was, for example, Market's business partner and collaborator on an item Gluck now accuses Temu

of infringing, as well as Clot's, SSUR's, and RETNA's attorney or agent, from which he obtained

an intimate understanding of their works.  Moreover, Temu's reliance was reasonable given that

the settlement agreements contained a provision ███████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

███████████████.  Paragraph 2.5 of the settlement agreements provide that █████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  Paragraph

2.5.

82.    Temu is entitled to rescission of the settlement agreements entered into by Temu,

Gluck, Cookies, and Alec Monopoly.  Temu paid to settle with Gluck's clients based on the truth

of Gluck's representation, but Temu would not have otherwise settled or agreed to the terms in the

agreements if it knew Gluck's representations were false.

83.    As a result of Gluck's misrepresentations, Temu has also incurred damages

including investigating Gluck's new claims, responding to Gluck, hiring outside counsel, and filing

this lawsuit.

**COUNT THREE**
**Breach of Contract**

84.    Temu repeats and realleges the allegations set forth above as if fully set forth herein.

85.    Temu, Gluck, and the Gluck Clients entered into settlement agreements.  The

agreement between Temu and Alec Monopoly was signed by Gluck and Alec Monopoly on

November 9, 2024, and by Temu on December 3, 2024.  The agreement between Temu and Cookies was signed by Gluck and Cookies on November 3, 2024, and by Temu on December 3, 2024.

86.    Temu has performed its obligations under the contract and has made all payments due to date.  From after the time that Temu discovered Gluck's misconduct, it made all payments under protest, expressly reserving all of its rights, including to obtain repayment of these and all other payments.

87.    Gluck breached his obligations under Paragraphs 2.4 and 2.5 of the agreements by ███████████████████████████ while the agreements were being executed and by ████████████████████. Per Paragraph 2.5, Gluck's actions constitute a █████████████ of Paragraph 2.4 that provides Temu with ████████████████████ ████████.

88.    As a result of Gluck's breaches, Temu incurred damages, including because it agreed to terms it would not have otherwise agreed to, including payment terms, based on the truth of Gluck's representation, and Temu would not have otherwise settled or agreed to the terms in the agreements if it knew Gluck's representations were false.  Temu also incurred damages investigating Gluck's new claims, responding to Gluck, hiring outside counsel, and filing this lawsuit.

89.    Gluck's breaches further deprived Temu of the essence of the agreement because Temu would not have otherwise agreed to the settlement terms.  Temu is entitled to rescission of the settlement agreements entered into by Temu, Gluck, Cookies, and Alec Monopoly.

**COUNT FOUR**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

90.     Temu repeats and realleges the allegations set forth above as if fully set forth herein.

91.     Gluck's actions, detailed above, constitute a breach of the covenant of good faith and fair dealing implicit in all contracts.

92.     By ███████████████████ while the agreements were being executed and by ███████████████████████, Gluck never intended for Temu to receive the benefits it bargained for under the contract and destroyed Temu's right to receive the bargained-for litigation peace under the agreements.

93.     Through this conduct, Gluck acted in bad faith and violated Temu's reasonable expectations.

94.     As a result of Gluck's breaches, Temu incurred damages, including because it agreed to terms it would not have otherwise agreed to, including payment terms, based on the truth of Gluck's representation, and Temu would not have otherwise settled or agreed to the terms in the agreements if it knew Gluck's representations were false or inaccurate.  Temu also incurred damages investigating Gluck's new claims, responding to Gluck, hiring outside counsel, and filing this lawsuit.

### COUNT FIVE
### Unjust Enrichment

97.     Temu repeats and realleges the allegations set forth above as if fully set forth herein.

98.     Temu seeks an equitable remedy for Gluck's unjust enrichment.

99.     Gluck and the Gluck Clients have intentionally retained benefits in the form of the settlement amounts, including Gluck's contingency fees from the settlement amounts.

100.    This benefit was retained at Temu's expense, as Gluck fraudulently misled Temu into entering the agreements and their terms based on Gluck's false representations in Paragraph 2.4 of the settlement agreements.

101.    Gluck's fraudulent misrepresentations demonstrate that retention of the settlement amount he and the Gluck Clients received would be unjust.

102.    Temu is entitled to damages in an amount to be proven at trial, but equal to the unjust enrichment Gluck and the Gluck Clients received from the settlement.

## JURY DEMAND

103.    Temu demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Temu prays for judgment against Gluck in favor of Temu on all counts as follows:

A.  A judgment in favor of Temu on all claims pleaded herein;

B.  Rescission of the settlement agreements entered into between Temu, Gluck, and the Gluck Clients and all appropriate remedies including but not limited to return of all the funds Temu has paid to date;

C.  In the alternative of rescission, an award of restitutionary and consequential damages;

D.  An award of punitive damages as a result of Gluck's knowing and willful misrepresentation;

E.  That Temu be granted pre-judgment and post-judgment interest on the damages caused by Gluck;

F.  That Temu be awarded reasonable attorneys' fees and costs as allowable by law and pursuant to the "Attorneys' Fees" provision in the settlement agreements;

G.  That Temu be granted such other and further relief as the Court deems just and proper.

Respectfully submitted,

WHALECO, INC. d/b/a Temu

By its attorneys:

/s/ John J. Butts
John J. Butts (BBO No. 643201)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000
john.butts@wilmerhale.com

Ajay S. Krishnan (*Pro Hac Vice forthcoming*)
Matan Shacham (*Pro Hac Vice forthcoming*)
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188
AKrishnan@keker.com
MShacham@keker.com

Dated: May 5, 2025

# EXHIBIT 1

# FILED UNDER SEAL

# EXHIBIT 2

# FILED UNDER SEAL